1
2
3
4
5
6
7            **UNITED STATES DISTRICT COURT**
8                 **DISTRICT OF NEVADA**
9

10   VALERIE HIRATA, *et al*.,

11        Plaintiffs,                          Case No. 2:13-cv-2302-LDG (VCF)

12   v.                                        **ORDER**

13   SOUTHERN NEVADA HEALTH
     DISTRICT, *et al*.,
14
          Defendants.
15

16

17        Presently before the Court are the defendants' Motions for Summary Judgment

18   (ECF Nos. 235, 236, 237, and 238). The plaintiffs oppose each of the motions (ECF Nos.

19   221, 222, 223, and 224).[1] The Court will grant the motions.

20   Motion for Summary Judgment

21        In considering a motion for summary judgment, the court performs "the threshold

22   inquiry of determining whether there is the need for a trial—whether, in other words, there

23   are any genuine factual issues that properly can be resolved only by a finder of fact

24   _____

25        [1]     Pursuant to stipulation of the parties, the defendants withdrew and re-filed
     their motions for summary judgment to correct technical deficiencies. Plaintiffs relied on
26   their original oppositions.

because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Arango*, 670 F.3d at 992.

A material fact is one required to prove a basic element of a claim. *Anderson,* 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*, at 323. As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in issue, the moving party can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.,* at 325. Conversely, when the burden of proof at trial rests

on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact. Fed. R. Civ. Pro. 56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The allegations or denials of a pleading, however, will not defeat a well-founded motion. Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). That is, the opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

Background

Plaintiff Angela Jones began working in September 2008 as Environmental Health Supervisor, supervising the Pool Plan Review section of the Environmental Health Division of Defendant Southern Nevada Health District (Health District). Plaintiffs Valerie Hirata and Whitnie Taylor were Environmental Health Specialists in that section. The Pool Plan Review section processed permit applications for new construction or remodeling of public pools and spas.

The plaintiffs were members of the Service Employees International Union, Local 1107 (the Union) and worked under a Collective Bargaining Agreement that included specific grievance and arbitration provisions.

For a brief period until March 2009, Jones reported to an Environmental Health Manager. Following that individual's resignation, Jones reported directly to Defendant Environmental Health Director Glenn Savage.

In December 2008, the Virginia Graham Baker Act, a federal law requiring that public pool owners have their pools equipped with special pumps and drain covers to prevent drowning accidents, became effective. In Nevada, the installation of the equipment required pool owners to first obtain a remodel permit under Nevada Administrate Code §444 *et seq.* By early 2009, the review and approval of "VGBA remodel permit applications" was backlogged. The backlog continued to grow over the next two years. By December 2010, there were nearly 2,000 applications pending.

On January 4, 2011, Savage held a meeting with every manager and director in the Environmental Health Division. Jones attended the meeting. The minutes of that meeting indicate that the topic of the backlog of VGBA remodel permit applications was discussed. As recorded in the minutes:

> Glenn stated Pool Plan Review program appears to be failing. Discussion ensued regarding past barriers, Regs, SOP's, training, failing or failed past practices, etc. Angela Jones stated those barriers were no longer present as of Dec and that her staff is now able to concentrate on completing and releasing pools and spas from plan review. There was a consensus among the group to allow Angela the first quarter of 2011 (Jan-Mar) to demonstrate the program's ability to release pools/spas. This was considered to the last chance period for the PPR program to move forward, otherwise, restructuring the program would be necessary in order to meet expectations. Angela will be given 1st quarter in 2011 to show significant improvements in terms of releasing pools from plan review to operations. A target of 420 pool or spa releases from plan review (140 a month) was established and agreed upon for the quarter. This is equal to one release per day for each assigned staff member.

Jones directed Hirata and Taylor that they did not need to process VGBA remodel permit applications during this period. Hirata did not complete any VGBA remodel permit applications. The Pool Plan Review section completed 120 VGBA remodel permit applications by the end of the first quarter of 2011.

On April 2, 2011, the plaintiffs and other employees in the Pool Plan Review section each signed an Employee Grievance Form. For the Statement of Grievance, each form referenced an attached group statement. In their Exhibit 26, plaintiffs include nine pages that "address multiple grievances." Jones declares that the document was submitted to the Union and then forwarded to Defendant Robert Gunnoe, of the Health District's Human Resources department.[2]

On April 5, 2011, Savage issued a memorandum moving the Pool Program to be under the direction of defendant Steve Goode, Environmental Health Manager of Operations. Following this assignment, Jones reported directly to Goode, who reported to Savage. Savage also assigned defendant Amy Irani, an Environmental Health Supervisor in the Solid Waste Program, "to conduct an evaluation/assessment of the administration of the pool program. Her evaluation will include such topics as project management, data collection, distribution of information/records, time lines of projects and Environmental Health Specialists/Administrative Staff roles in the execution of assigned projects and job duties." When Irani completed her assessment, she gave her final report to Savage.

On April 8, 2011, Hirata submitted a binder, with more than 300 pages, to Montana Garcia of the Health District's Human Resources department. The binder included the nine pages of grievances submitted as part of Exhibit 26.

On April 18, 2011, Gunnoe sent an e-mail to Hirata stating that they could not proceed further with the materials dropped off with Montana until they knew more

---

[2]    In their opposition, the plaintiffs cite Jones' declaration and an e-mail from Gunnoe for the assertion that this Group Grievance was submitted to the Union on April 4, 2011, and forwarded to Gunnoe on the same day. The evidence does not support the assertion. Jones does not indicate when the document was submitted to the Union. Further, while she asserts that the Group Grievance was forwarded to Gunnoe, she does not provide any foundation to establish that she is competent to testify that the grievance was forwarded to Gunnoe. In his e-mail, Gunnoe does not acknowledge receipt, but indicates only that he had seen some formal complaint forms that were dated April 2, 2011, which was "several days before we got any materials at all."

specifically who is complaining and whether all of the issues or allegations applied to all employees, or whether some aspects applied to some employees but not others.  He noted that it would "help us a great deal to get some additional basic information that will allow us to proceed further."  On April 19, Hirata replied that she would "discuss these issues with all parties involved, and will contact you at a later date on how the group would like to proceed."  Jones testified that the Pool Plan Review staff decided to not respond to Gunnoe's inquiry because Irani was conducting an evaluation, and they would work with Irani.  Hirata testified that the group instead decided to participate in Irani's assessment to address the issues, and did not provide further information to Human Resources until August 2011.

On April 21, 2011, Jones and Hirata each filed a Charge of Discrimination with the Equal Employment Opportunity Commission.  On April 25, 2011, Taylor filed a nearly-identical Charge of Discrimination.  Each asserted that, beginning January 4, 2011, the Health District had requested the Pool Plan Review section to ignore state laws to reduce backlog.  Each further asserted that if they did go along with the request, the group was threatened with transfers and separations.  Each further alleged they had been discriminated against on the basis of their sex and race, and retaliated against in violation of Title VII.  Although each plaintiff received a right to sue letter, none filed a complaint based on the Charges.

In June 2011, Hirata and another Pool Plan Review employee attended a breakfast with the defendant Lawrence Sands, the Health District's Chief Health Officer.  Hirata gave the binder to Sands.[3]  Sands met with Savage regarding the binder, and indicated he would be sending the binder to Human Resources to investigate.  Sands testified that he told

---

[3]     Plaintiffs assert that their Exhibit 37 is a copy of a written statement that Hirata read to Sands.  They do not cite to any evidence to support their assertion that Hirata read the statement.

Savage that he was holding Savage accountable for ensuring the program was operating as it needed to and that "everybody had to be held accountable, you know, for their performance and achieving the goals of the program."

On August 9, 2011, Goode issued Jones a Coaching and Counseling, identifying numerous employee performance issues. A Coaching and Counseling is a pre-disciplinary action that is not placed in an employee's permanent Human Resources file, but is kept only in the supervisor's file for that employee. Goode testified that he did not prepare the written Coaching and Counseling statement. He further testified that he did not agree with several of the assessments in the document, and that he had not observed conduct by Jones reflected in those assessments. Goode testified he believed that the document had been written by Robert Newton at the direction of Savage.

On August 28 and 29, 2011, staff of the Pool Plan Review section signed a nine-page document that started: "This document is a group retaliation statement written by members of the Pool Program for Southern Nevada Health District Chief Health Officer Dr. Sands." The document then recites the intent of its authors to submit the document to Goode, to be given to Savage, to be given to Sands, thus complying with the Health District's chain of command.

On August 31, 2011, Jones received a written reprimand from Goode. The reprimand noted the prior Coaching and Counseling, and specifically the counseling to provide complete information in a timely manner as well as providing professional and succinct communication. The reprimand noted an update provided by Jones, indicating the update contained extraneous personal opinions and suggestions. It further noted that the document submitted for payroll processing "was extremely large and appeared purposefully voluminous" and included redundant copies of itineraries, e-mails, and memos. The reprimand also noted the August 29, 2011, document, noting it had been submitted to Human Resources. The reprimand noted the August 29, 2011 document referenced

"confidential information" in the prior Coaching and Counseling. As such, Jones was reprimanded for disclosing the "confidential information" from her Coaching and Counseling to her subordinates.

On September 15, 2011, Savage and Goode suspended Jones for three days for statements she made during an e-mail exchange with Goode.

On September 21, 2011, Savage placed Jones on paid administrative leave "pending further investigation of possible violations of the District's Personnel Code and EH policies." The memorandum did not identify the asserted violations. Jones was directed to not communicate with any Health District staff other than in Human Resources, her manager, or her Union representative, and that any conduct in violation of this instruction would be viewed as insubordination.

On September 22, 2011, Jones grieved the suspension. On October 11, 2011, a Hearing Officer issued a memorandum recommending that the proposed suspension not be imposed. The Hearing Officer determined that Jones' "actions indicate she may have issues with following directives and her style of communication appears excessive and over documented." The Hearing Officer also noted, however, the relatively short period of time from the first Coaching and Counseling to suspension was insufficient to allow Jones to develop a significant change in her style of communication or for her management team to assist her with a better method of communicating.

On September 22, 2011, the "bargaining unit employees of the SNHD pool program" filed a formal grievance with Human Resources through the Union. A formal Step I Grievance Hearing was convened on October 4, 2011. On October 18, 2011, the Hearing Officer (defendant Angus MacEachern) denied the grievance. The Union did not request arbitration.

On October 18, 2011, Savage notified Jones that he was rescinding the proposed three-day suspension of September 15, 2011. Savage assigned Jones to what the Health

District terms a "Supervisory Administrative Project" as they had previously discussed on October 11, 2011. Jones was tasked with providing a complete narrative description of the reason for and functions of the Pool Plan Review section, and providing complete and rigorous documentation to assist in day-to-day management of the Pool Plan Review section in six different areas. While Jones was assigned to this project, she did not actively supervise the Pool Plan Review section.

At about the same time, additional staff were assigned to the Pool Plan Review section, with defendant Susan LaBay supervising one team that included defendant Jackie Raiche-Curl, Lorraine Forston, Steve Zimmerman and plaintiff Taylor. Hirata continued to work with the other Pool Plan Review group.

On November 2, 2011, Taylor sent an e-mail to Goode and Garcia attaching an e-mail chain between Goode and Zimmerman indicating that she agreed with Zimmerman's position. She further noted that she would follow the directives of her supervisor, but that she did not agree to "not follow the installation guide of the equipment, approve projects where the pools and spas are not sound and to approve equipment not installed correctly just to move the project out of Plan Review." On November 14, 2011, and December 11, 2011, Taylor received Coaching and Counseling regarding her work performance. The Coaching and Counseling were administered by LaBay, Taylor's supervisor.

Taylor submitted her resignation on August 29, 2012, effective September 7, 2012, stating that "the targets and methods of accomplishing the daily required six inspections in extreme heat forsaking health and safety of the general public has made it mentally and physically impossible for me to continue in this manner."

On January 20, 2012, Goode issued a Coaching and Counseling to Hirata for failing to meet the established job performance standard for each Pool Plan Review staff of an average of 5 service requests per week. Hirata acknowledged, in her deposition, that her productivity was low but explained that it was the result of assisting Jones with her tasks.

She was counseled to bring forward concerns to her management if she is aware that she is unable to meet an established performance standard, and to report daily. Success would be measured by meeting the established work performance measures. She was expected to move a minimum of 60 service requests or variances during the next three months. On January 31, 2012, Hirata submitted a proposed 90-day Plan of Action identifying the proposed variances, completed plan reviews, and completed projects through April 19, 2012 (90 days after the coaching and counseling). Hirata proposed completing a total of 71 projects and 6 variances. She identified additional and unforeseen issues and projects that might cause her to not meet her goal. Goode accepted the plan.

On April 6, 2012, Goode sent Hirata an e-mail praising her for her performance during March. Hirata replied that she would have completed 53 projects by the end of the day, and anticipated completing 60 by the end of the following week.

On June 27, 2012, Goode sent Hirata a memorandum regarding a meeting of the day before. The memo noted that Hirata had achieved her goal during the three-month period, indicating she could meet the performance standard, but that her work performance was again at a sub-par level.

On July 11, 2012, Savage placed Hirata on Paid Administrative Leave pending further investigation of possible violations of the Health District's personnel code. Prior to that time, documents were discovered in a box under Hirata's desk. Many of the documents concerned work performed during the three-month period, but which had not been turned in for review and approval by Goode. A review of the documents also indicated other errors by Hirata in performing her work. On July 23, 2012, Savage proposed a twenty-day suspension without pay commencing July 24, 2012. Hirata formally grieved the suspension on August 3, 2012. At the hearing, the Health District and the Union negotiated a reduction of the suspension from twenty days to three days. Hirata

1  testified that she consulted legal counsel as to whether to pursue arbitration, and elected to
2  not do so.

3       After returning from her suspension, Hirata was to perform two inspections while
4  being observed by two supervisors.  Though the second inspection was located just a few
5  minutes from the first inspection, Hirata got lost, did not arrive at the second inspection,
6  and did not notify the supervisors.  Raiche-Curl issued a Coaching and Counseling for the
7  failure to communicate with her supervisors.

8       On September 21, 2012, Hirata submitted her resignation (effective October 5,
9  2012), asserting that she considered her current working conditions to be hostile, unhealthy
10 and retaliatory.

11      In March 2012, Jones resumed her duties as a supervisor.   On April 25, 2012,
12 LaBay completed a review of the documents submitted by Jones regarding her work on the
13 Supervisory Administrative Project.  Labay stated her opinion that Jones should have been
14 able to easily complete the six projects "[g]iven the fact that Ms. Jones was unable to
15 supervise her staff for a 6-7 month period."  She further noted her conclusion that not one
16 project had been completed, that most had not been started, and that the submitted
17 material indicated that Jones had completed "very little original work."

18      In April, a co-worker reported that Jones had placed another co-worker's Health
19 District-issued computer in her car.  Defendant Kimberly DiPasquale, a Human Resource
20 Analyst, conducted an investigation that concluded with her report on May 17, 2012.  She
21 concluded that Jones had removed the computer without authorization.

22      Based on both the deficient work product and the taking of Health District property
23 without authorization, Savage demoted Jones to Environmental Health Specialist II
24 effective May 23, 2012, and re-assigned her to a field assignment under the supervision of
25 LaBay.  Through the Union, Jones formally grieved her demotion.  A Step I hearing was
26 held on August 29, 2012, and the Hearing Officer denied the grievance on August 31,

1   2012.  On September 6, 2012, the Union notified Human Resources that it was intending to

2   arbitrate, and requesting that the grievance be held in abeyance pending the Union's

3   decision whether it would proceed with the arbitration.  On October 2, 2012, the Union

4   notified Jones that it would not arbitrate her grievance, and would officially withdraw her

5   case.  The Union also indicated to Jones that she still had a right to appeal.

6       On December 10, 2012, Jones submitted her letter of resignation effective

7   December 21, 2012.

8   <u>Analysis</u>

9       <u>First Amendment Retaliation Claim - Statute of Limitations</u>

10      The defendants argue that, as the statute of limitations is two years, and as the

11  plaintiffs filed their complaint on December 18, 2013, their First Amendment claim is barred

12  to the extent it is based on adverse employment actions occurring before December 18,

13  2011.  In response, the plaintiffs argue that their claims for constructive discharge did not

14  accrue until they submitted their letters of resignation.  The plaintiffs do not offer any

15  argument that their retaliation claim is not barred as to adverse employment actions

16  occurring prior to December 18, 2011.  Accordingly, the Court will grant summary judgment

17  on the retaliation claim to the extent that it seeks recovery for any adverse employment

18  action prior to December 18, 2011.

19      <u>First Amendment Retaliation Claim - Merits</u>

20      The controlling Supreme Court decision is *Garcetti v. Ceballos*, which held "that

21  when public employees make statements pursuant to their official duties, the employees

22  are not speaking as citizens for First Amendment purposes, and the Constitution does not

23  insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S.

24  410, 421 (2006).  The Ninth Circuit has provided a further test in order to determine when a

25  public employee's speech receives First Amendment protection:  "First, the plaintiff bears

26  the burden of showing that the speech addressed an issue of public concern . . . . Second,

the plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee . . . . Third, the plaintiff bears the burden of showing the state took adverse employment action and that the speech was a substantial or motivating factor in the adverse action . . . . Fourth, if the plaintiff has passed the first three steps, the burden shifts to the government to show that . . . the state's legitimate administrative interests outweigh the employee's First Amendment rights . . . . Fifth and finally, if the government fails the [above] balancing test, it alternatively bears the burden of demonstrating that it would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) (quotations and citations omitted).

While the plaintiffs cannot maintain this claim based on adverse employment actions that occurred prior to December 18, 2011, an issue remains whether they were subject to any retaliatory acts after that date, regardless of whether the protected speech occurred prior to that date. The plaintiffs allege they engaged in ten separate acts of protected speech between April 4, 2011, and November 2, 2011. They identify the first two such acts as their submission of a Group Grievance to the Union and to Human Resources on April 4, 2011. The third act of protected speech was the delivery of a the Group Grievance Binder on April 8, 2011, to Garcia of Human Resources. The fourth act was plaintiffs' filing of EEOC charges on about April 21, 2011, in which each alleged the Health District had instructed them to ignore state law in their jobs. The fifth and sixth protected acts were Hirata's statement to Sands on July 2011, and her act of giving him the same Group Grievance Binder previously submitted to Human Resources. The seventh protected act was the Group Retaliation Statement written by the staff of the Pool Plan Review section in response to a request by Sands. The eighth protected act was Hirata's meeting with a county commissioner, in which Hirata asserts that she spoke about various issues that are consistent with the other asserted acts of protected speech. The ninth protected act was

13

the Pool Plan Review employees' filing of a Group Grievance in September 2011. The final protected act was Taylor's November 2, 2011, e-mail to Goode and Garcia indicating that she would follow the directives of her supervisor, but that she did not agree to "not follow the installation guide of the equipment, approve projects where the pools and spas are not sound and to approve equipment not installed correctly just to move the project out of Plan Review."

Initially, the Court must note that the plaintiffs have not offered competent evidence as to when the Health District or any of the individual defendants first became aware of the April Group Grievance prior to April 5, 2011. Hirata declared and testified that she submitted the Binder, which contained the April Group Grievance, to Garcia on April 8, 2011. Jones declared that the April Group Grievance was submitted to the Union and then forwarded to Human Resources, but does not identify the date on which this occurred. Gunnoe's April 18, 2011, e-mail does not establish the date he first became aware of the April Group Grievance. Accordingly, the plaintiffs are also unable to maintain their claim to the extent it is based on adverse actions occurring prior to April 8, 2011.

The Court also cannot conclude that every statement within the April Group Grievance, and the Binder within which it was contained, amounted to protected speech. The Court cannot accept plaintiffs' suggestion as to the breadth of the "public concern" prong. It would appear to the Court that, as suggested by plaintiffs, every public employee's criticism of a co-worker, subordinate, or supervisor as inefficient, incompetent, or is otherwise careless, would constitute a matter of public concern. Similarly, the plaintiffs' argument suggests that any identification of a co-worker's error in completing a form documenting a regulated structure is a matter of public concern. Though the "public concern" prong is to be construed broadly, the Court will not construe so broadly that any speech by a public employee regarding any aspect of their public employment constitutes a matter of public concern. Of particular concern to the Court is that, while the Binder and

14

April Group Grievance may contain some speech directed to public concerns, the vast majority of the speech does not address matters of public concern. The content of the Binder reflects its context. In January 2001, following a meeting of all supervisors and managers, Savage tasked the Pool Plan Review section with completing the review of 20 remodel pool plan applications each month by each staff member (effectively, one remodel pool plan application reviewed each business day). Statements within the Binder reflect Jones' perception of the mis-perceptions of other supervisors and managers, particularly as to mis-perceptions relevant to the measuring of productivity through the release of pool plans. To a great extent, the Binder appears to be compiled to alert other Health District employees of the issues impeding the productivity (as measured by the completion of Pool Plan reviews) of Pool Plan Review staff. Within this context, it becomes difficult to conclude that the few statements that might otherwise be of public concern were uttered because the speaker considered them to be of public concern, rather than the internal employment matter regarding the propriety of measuring productivity by completion of remodel pool plan applications.

Further, even if the Binder and its included April Group Grievance were considered to be a matter of public concern, the plaintiffs have not shown they were speaking as private citizens when Hirata delivered the Binder (and its included Group Grievance) to Garcia. The plaintiffs argue that they were speaking as private citizens because their specific job duty did not include disseminating a group grievance outlining illegal behavior. The argument fails as it is, again, overly broad. Whether the plaintiffs were speaking as private citizens must be considered within the context of that speech. Stated otherwise, the content of the Binder and April Group Grievance reflects the speech of a public employee acting as an employee, rather than a public employee acting as a private citizen.

Finally, even if the April Group Grievance and Binder were considered speech on a public matter by a private citizen, the plaintiffs have not shown that they were subject to

adverse employment actions because of the speech.  In their opposition, the plaintiffs identify Irani's negative evaluation of the Pool Program Review section as the adverse employment action, and attribute this action not only to Irani, but also to Savage, Gunnoe, MacEachern, and Sands because each, in some way, was aware that the evaluation was being performed.  While the plaintiffs complain of some of Irani's conclusions and observations, and offer testimony of others indicating their disagreement with those conclusions and observations, such disagreement does not establish that either the performance of the evaluation, or Irani's completed report, amounted to an adverse employment action.  In sum, the plaintiffs have not offered evidence supporting a plausible inference that Savage ordered the evaluation, or that Irani performed the evaluation, as an *adverse* employment action against the plaintiffs or the other staff of the Pool Plan Review section.

Hirata's delivery of the Binder, as well as her additional statements, to Sands on July 5, 2011, also  fails to support a claim for retaliation.  The Court assumes that, because the Binder included the April Group Grievance, the delivery of the Binder to Sands constitutes speech by each of the plaintiffs.  Hirata's separate statement to Sands, however, is attributable as speech only of Hirata, and not of Jones or Taylor.  While the content of the Binder and April Group Grievance did not change, Hirata's act of delivering the Binder outside of the chain of command suggests the plaintiffs were speaking as private citizens (despite the speech itself indicating that it was uttered as public employees).

However, assuming the speech of Hirata and the other plaintiffs to Sands was on a matter of public concern in the capacity of private citizens, the plaintiffs have not identified any nexus between that speech and an adverse employment action.  The plaintiffs point to Jones receiving a Coaching and Counseling on August 9, 2011.  As previously noted, Jones cannot maintain a retaliation claim on this adverse action as it is barred by the statute of limitations.  The plaintiffs have not offered any plausible argument that the

actions taken against them in 2012 were in response to Hirata delivering the binder to Sands on July 5, 2011.

As noted previously, the plaintiffs identified their Group Retaliation Statement, made in response to a request from Sands as the seventh protected act of speech. The plaintiffs identify the adverse actions following these acts of speech as the written reprimand to Jones and Jones' three-day suspension. As the written reprimand indicates it was written with awareness of the Group Retaliation Statement, and as the three-day suspension rested, in part, on the written reprimand, a plausible inference exists that the actions were taken in response to protected speech. While the defendants have proffered a legitimate reason for the written reprimand and suspension, the totality of the evidence does not permit a conclusion, as a matter of law, that the state's interest outweighed Jones' speech rights or that the defendants would have taken the action despite Jones' speech. However, as noted previously, as these adverse actions occurred prior to December 18, 2011, the statute of limitations precludes Jones from maintaining her retaliation claim to the extent it is based on these actions.

The plaintiffs identify Hirata's conversation with a county commissioner as their eighth act of protected speech. This act of speech, however, is attributable as the speech of Hirata, and not of Jones or Taylor. Hirata testified that, following this conversation, Savage directed her that she was not to have contact with people outside of the Health District regarding Health District issues. Assuming Hirata's conversation to the county commissioner was on a matter of public concern by a private citizen, the Court would conclude that the direction provided by Savage to Hirata would be an adverse employment action. That is, the Court finds that the act of giving the direction to Hirata, which was given in the employment context from a supervisor to a subordinate, would have the effect of chilling Hirata's protected speech. Hirata also testified, however, that this direction was given within weeks of her meeting with the county commissioner. Accordingly, as this

17

adverse action occurred prior to December 18, 2011, the statute of limitations precludes Hirata from maintaining her retaliation claim to the extent it is based on this action.

The plaintiffs identify their ninth act of protected speech as the September 22, 2011, Group Grievance which broadly alleged that the workplace environment violated state and federal law. A formal hearing was set and convened for the September Group Grievance, and the grievance was denied in October. Assuming the broad allegation of the September Group Grievance constitutes protected speech on a matter of public concern by a private citizen, the plaintiffs have not shown they were subject to an *adverse* employment action. The plaintiffs propose that the adverse actions were (1) the re-assignment of Jones in which she was relieved of supervisory responsibilities and was instead tasked with a supervisory administrative project, and (2) the assignment of Taylor to a second, separately supervised group of staff in the Pool Plan Review section.

The evidence establishes that, in October 2011, additional staff were added to the Pool Plan Review section with a second group created and separately supervised. In addition, Jones was temporarily relieved of her supervisory duties with instructions to work on six projects that addressed several of the critical issues asserted by the Pool Plan Review section. While the action occurred in temporal proximity to plaintiffs' speech, neither Jones nor Taylor has met her burden of showing the action was adverse. A plausible inference can be drawn that the reorganization and additional staffing was in response to the speech of the staff of the Pool Plan Review section over the prior months. That inference requires recognizing, however, that the actions taken by defendants were largely and primarily consistent with the actions that had been requested by the staff of the Pool Plan Review section. The plaintiffs and other employees argued for additional staff; Pool Plan Review was assigned additional staff. The assignment of that additional staff necessarily resulted in some reorganization. Taylor has not offered any evidence raising a plausible inference that her assignment resulted from her act of signing either the

18

1  September Group Grievance, the August Group Retaliation Statement, or the April Group

2  Grievance that was included in the Binder.

3       Similarly, Jones has not offered evidence raising a plausible inference that the

4  decision to remove her supervisory duties and have her work on a supervisory

5  administrative project was an adverse action in retaliation for signing the September Group

6  Grievance, the August Group Retaliation Statement, or the April Group Grievance that was

7  included in the Binder.  As indicated from the content of the Binder, the plaintiffs and other

8  employees asserted a need to establish procedures and correct certain past deficiencies

9  that would permit the efficient completion of remodel pool plan applications; Jones was

10  provided an opportunity to specifically address and resolve those concerns.  To the extent

11  that the decision to relieve her of her supervisory duties can be considered adverse, the

12  defendants have met their burden of showing a legitimate need outweighing Jones' First

13  Amendment rights.  The totality of the evidence suggests an inference to which all parties

14  continually allude: there were issues concerning the work and productivity of the Pool Plan

15  Review section.  The plaintiffs, and other Pool Plan Review staff, acknowledged some

16  responsibility for these issues but otherwise largely attributed the issues to external factors

17  (that is, external to the group of Pool Plan Review employees in 2011).  The defendants,

18  and particularly the management directly responsible for the Pool Plan Review section

19  (other than Jones) attributed the issues to Jones and to the low-productivity of her staff

20  (rather than issues faced by her staff).  In this context, the defendants could legitimately

21  engage in an effort to reorganize the Pool Plan Review section, including giving Jones a

22  temporary task relevant to her work as the supervisor that would require her full attention.

23  Jones has not shown that the defendants' decision to temporarily re-assign her was

24  pretextual to cover a retaliatory act.

25       Finally, the plaintiffs identify Taylor's November 2011 e-mail as their tenth protected

26  act of speech.  This act of speech, however, is attributable only as to Taylor.  Assuming

that Taylor's e-mail to Goode and Garcia constitutes protected speech, she has not shown

that the defendants took an adverse employment action against her, for which the speech

was a substantial or motivating factor in the adverse action, after December 18, 2011. The

plaintiffs identified the adverse action against Taylor as the Coaching and Counseling she

received in November and December of 2011. The statute of limitations bars Taylor from

maintaining her retaliation claim to the extent it is based on these acts. Further, while the

evidence establishes a temporal proximity to Taylor's speech, the defendants have shown

a legitimate state interest that outweighed Taylor's right. Specifically, the evidence

establishes that Taylor received the Coaching and Counseling for low-productivity.

The plaintiffs argue that they were also subject to the following adverse employment

actions in 2012 in retaliation for their speech in 2011: Hirata received a Coaching and

Counseling on January 12, 2012; LaBay gave a negative peer review, on April 25, of

Jones' work performed as part of the employee action plan; Jones was demoted on May

22, for taking a computer home;[4] some Group Grievance information that was stored at the

desks of Jones and Hirata was destroyed;[5] LaBay issued a report regarding the documents

that were retrieved from Hirata's desk; Hirata was placed on Paid Administrative Leave in

July 2012; Hirata was suspended for 20 days; the Health District offered Hirata a Last

Chance Agreement; Jones was required to perform an outdoor pool inspection during the

afternoon of a high heat advisory day on her return from leave; Hirata received a Coaching

---

[4]    The evidence establishes that Jones was also demoted for her deficient work performance which was reported by LaBay in her review of Jones' work.

[5]    While the plaintiffs suggest this destruction occurred on Memorial Day in 2012, they offer no evidence to support the suggestion. The evidence permits an inference that documents were retrieved from the desks of Hirata and Jones on that day. The evidence also permits an inference that, at a later time, some documents (which may or may not have been the documents collected on Memorial Day) were later destroyed, perhaps merely by being placed in a recycling bin. The defendants have offered evidence that the only documents that were destroyed were the extra copies that duplicated documents that were not destroyed.

and Counseling to Hirata for getting lost; Jones and Hirata lost access to their work e-mail accounts in August of 2012; and finally the constructive discharge of each plaintiff from August to December 2012.

Hirata cannot maintain her claim based on the actions taken against her beginning in January 2012 with the Coaching and Counseling for low work performance and culminating in her three-day suspension and the Health District's requirement that she sign a Last Chance Agreement. This Coaching and Counseling, which occurred several months after her last asserted act of protected speech, concerned Hirata's low work performance. The evidence establishes that, following the Coaching and Counseling, and pursuant to her own plan of action, Hirata's work performance improved for three months. The evidence also establishes, however, that (contrary to Hirata's representations to her manager) she had not fully completed the work, and that she had committed errors in her work. This evidence was the result of the discovery of documents in a box under Hirata's desk and in her desk. While Hirata argues (as an additional adverse action against her) that this evidence was purged and destroyed, she offers no competent evidence to support that argument. While Hirata argues the review of those documents was an adverse action, the defendants had a legitimate interest in reviewing the documents. The documents concerned the work for which Hirata was publicly employed. Hirata argues that the conclusions of the review were adverse. The Court agrees, but Hirata offers no competent evidence that the conclusions were inaccurate. Rather, the evidence establishes that the defendants imposed a 20-day suspension on Hirata as a result of her conduct relative to the documents. Hirata grieved that suspension. She was represented by the Union at the hearing, and ultimately the parties agreed to a reduction of the suspension from twenty days to three days on condition that Hirata sign a Last Chance Agreement. Although Hirata subsequently refused to sign the Last Chance Agreement, the Health District complied with its agreement to reduce the suspension to three days. Given the

circumstances, the Union considered this resolution a win for Hirata. This evidence requires the conclusion, as a matter of law, that the actions of the defendants arose from Hirata's work performance in 2012, and not in response to the identified acts of speech in 2011.

Similarly, Hirata has not shown that the Coaching and Counseling she received in August 2012 was in response to her speech in 2011. The evidence establishes that she received this Coaching and Counseling for failing to communicate with her supervisors.[6] The evidence further establishes that the Coaching and Counseling was in response to Hirata's failure to communicate with her superiors that she had become lost while attempting to travel to a location where she would perform a pool inspection while being observed by two supervisors. Hirata does not dispute that the two supervisors waited for more than 45 minutes after the time they expected Hirata to arrive, but did not receive any communication for Hirata. That Hirata did not have a Health District phone, but had only her personal phone, does not raise a triable issue of fact that the action was taken in response to the failure to communicate in August 2012, rather than because of speech that occurred more than ten months prior to that time.

The alleged retaliatory acts against Jones in 2012 fail for similar reasons. Jones identifies the review of her work product while relieved of her supervisory duties and her demotion based on that deficient work product as well as her unauthorized removal of Health District property as adverse actions. The evidence also establishes, however, that Jones grieved the decision to demote her. The hearing officer denied Jones' appeal and the Union then made the decision to not pursue arbitration of the decision. Jones did not pursue arbitration of the decision. The defendants have shown a legitimate reason for engaging in the conduct of reviewing Jones' work, for investigating Jones' removal of

---

[6] The plaintiffs' characterization that Hirata received the Coaching and Counseling for getting lost is unsupported by the evidence.

Health District property, and for imposing discipline as a result of its findings. Jones has not raised a triable issue of fact that the Health District's actions in May 2012 were pretext to cover retaliation for Jones' speech in 2011.

Jones also identifies, as an adverse action, the requirement that she perform an outdoor pool inspection during the afternoon of a high heat advisory day upon her return from leave. Jones does not offer any evidence, however, that this was a unique employment action, and that other staff of the Pool Plan Review section were not required to perform pool inspections in similar conditions. Jones does not offer any evidence that the defendants impeded her ability to perform in a safe manner as she had been trained.

Hirata and Jones complain that, upon their return to work in August 2012, they had restricted access to their work e-mails and other information necessary to perform their tasks. Neither offers evidence that this action was in response to their speech more than 10 months prior.

Finally, the plaintiffs' decisions to resign in late 2012 do not constitute an adverse and retaliatory act by the defendants for the plaintiffs' speech in 2011. Accordingly, the Court will grant summary judgment to the defendants on plaintiffs' claims that they were subject to retaliation in 2012 for protected acts of speech that occurred not later than September 2011.

Constructive Discharge

According to the Nevada Supreme Court, a "tortious constructive discharge is shown to exist upon proof that: (1) the employee's resignation was induced by actions and conditions that are violative of public policy; (2) a reasonable person in the employee's position at the time of resignation would have also resigned because of the aggravated and intolerable employment actions and conditions; (3) the employer had actual or constructive knowledge of the intolerable actions and conditions and their impact on the employee; and

(4) the situation could have been remedied." *Martin v. Sears, Roebuck and Co.*, 111 Nev. 923, 926 (1995). The plaintiffs' constructive discharge claims fail because they have not shown that the employment conditions to which they were subjected were aggravated and intolerable. Further, even assuming an issue of fact existed whether the conditions were intolerable, they have not shown that such was because of their speech rather than because of the productivity expectations of the Health District.

Conspiracy

The plaintiffs' final claim alleges that the individual defendants committed civil conspiracy in that they "intentionally and unlawfully" sought to violate the plaintiffs' First Amendment rights and induce their resignations (#1, ¶ 528). "To state a cause of action for civil conspiracy, the complaint must allege: 1) the formation and operation of the conspiracy; 2) the wrongful act or acts done pursuant thereto; and 3) the damage resulting from such act or acts." *Ungaro v. Desert Palace, Inc.*, 732 F. Supp. 1522, 1532 n.3 (D. Nev. 1989).

"The alleged facts must show either expressly or by reasonable inference that Defendant had knowledge of the object and purpose of the conspiracy, that there was an agreement to injure the Plaintiff, that there was a meeting of the minds on the objective and course of action, and that as a result one of the defendants committed an act resulting in the injury." *Id.* In Nevada, "[a]gents and employees of a corporation cannot conspire with the corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Collins v. Union Fed. Sav. & Loan Ass'n*, 99 Nev. 284, 303, 662 P.2d 610, 622 (1983).

The plaintiffs have not raised a triable issue of facts that the defendants, acting outside of their capacities as employees of the Health District, entered into an agreement to achieve the objective of violating the plaintiffs' rights and to induce their resignations. More particularly, the plaintiffs have not raised a triable issue of fact that the defendants

formed and agreed upon a course of action in any capacity other than as employees of the

Health District.

Accordingly,

THE COURT **ORDERS** that Defendants' Motions for Summary Judgment (Nos. 235, 236, 237, and 238) are GRANTED. The Clerk of the Court is instructed to enter judgment in favor of the defendants and against the plaintiffs.

DATED this ___ day of September, 2017.

_____
Lloyd D. George
United States District Judge